FISHER and others *vs.* SKILLMAN'S EXECUTORS.[*]

1. Under a bequest by a testator of his property, "to be equally divided, share and share alike, between my children and their legal heirs, that is to say, to J. S., D. B. S., W. S., A. S., and C. H., each a share, and the children and heirs of A. L. S., and of M. H., and of C. M. F., each a share," the legatees take *per stirpes.*

2. Where executors, directed to make a sale of the real estate of their testator, neglect their duty, and fail to obtain therefor as high a sum as might have been obtained but for their own default, they will be compelled to make up the deficiency.

3. An executor is liable for funds voluntarily placed in the hands of a co-executor and wasted.

4. An executor who delivers a mortgage to be canceled, is responsible if the debt be thereby lost.

*Mr. G. A. Allen,* for complainants.

*Mr. B. Van Syckel,* for defendants.

THE CHANCELLOR.

The complainants, who are grandchildren of Thomas Skillman, deceased, and legatees under his will, ask for an account of his estate from the defendants who are the executors of the will, and for payment of their legacies. They claim to have the residue of the estate divided equally *per capita* among them, and the defendants and other children of the testator. The will orders as follows :

"It is my will, and I direct that my executors hereinafter named, or the survivors of them, sell and dispose of all my

* CITED *in Macknet's Ex'rs* v. *Macknet,* 9 *C. E. Gr.* 294.

landed property." "Then it is my will, and I direct, that the proceeds of these sales, together with all and singular my personal and movable property, (except as hereinbefore specially bequeathed), be equally divided, share and share alike, between my children and their legal heirs, that is to say, to Jacob Skillman, D. Bishop Skillman, William Skillman, Ann Schenck, and Caroline Holcomb, each a share, and the children and heirs of Abraham L. Skillman, and of Martha Holcomb, and of Caroline Maria Fisher, each a share."

The first section of the will directed the payment of his debts; the second made provision for his widow; and the third is in these words : " I give and bequeath to my daughter, Ann Schenck, wife of Ernestus Schenck, the sum of two thousand dollars, to be paid to her by my executors. This is my view, making her equal with my other children, as I have not given her any outset."

At testator's death there were four children of Abraham L. Skillman, and one of Martha Holcomb, who are defendants in the suit, and four of Caroline Maria Fisher, who are complainants.

The complainants and the other grandchildren claim, that by the residuary clause they each take equally with the children of the testator ; that the estate must be divided *per capita* into fourteen shares, among the five children and nine grandchildren. This claim the children resist, claiming that it should be divided *per stirpes* into eight shares.

There has been much discussion in the courts, and some apparent diversity in their decisions, upon the construction of clauses like this, where property is devised to certain persons named or specified, and the heirs or children of others named or designated, to be equally divided between them.

The question is whether the children or heirs of the persons designated shall be construed collectively as together constituting one of the tenants in common, or whether each

child or heir shall be held to be one of those entitled to an equal share.

The words in their natural meaning clearly would in all such cases, give an equal share to each of the children or heirs of the person so designated. A gift to the children of A, equally to be divided between them, leaves no doubt. A gift to A and the four children of B, equally to be divided between them, would leave little or no doubt. This shows the natural meaning of the words. Doubt arises where a father leaves his estate to his two sons and the children or heirs of other deceased sons, equally to be divided between them. The doubt, I apprehend, arises not from any difficulty about the meaning of the words, but from the fact that such a disposition of the bulk of an estate is against our ideas of natural justice; it is different from that usually prompted by paternal affection.

One of the fundamental rules of construction is, that words must be construed in their usual and natural sense. To depart from this, and construe words in another sense, would do great injustice in all cases where wills or other documents are drawn with a careful regard to the correct meaning of the words used; and in by far the greater part of wills, as well as other documents, words are correctly used in their proper meaning. This rule at once yields, at least in construing wills, in all cases where it satisfactorily appears by the context that the word is used in another sense.

The decisions of the courts upon bequests of this kind are based upon this rule, and any discordance there may be in them arises from the effect given in different cases to the other provisions of the will in controlling such bequests.

Mr. Jarman, in his treatise on *Wills, Vol.* 2, *p.* 111, very fairly states the result of the English and American cases on this subject. "Where a gift is to the children of several persons, whether it be to the children of A and B, or to the children of A and the children of B, they take *per capita*, not *per stirpes*." "The same rule applies where a devise or bequest is made *to a person* described as standing in a certain relation to the testator, and the children of another person

standing in the same relation, as to my brother A and the children of my brother B : and of course it is immaterial that the objects of gift are the testator's own children and grandchildren ; as when a legacy was bequeathed equally between my son David, and the children of my son Robert."

"But this mode of construction will yield to a very faint glimpse of a different intention in the context. Thus, the mere fact that the annual income, until the distribution of the capital, is applicable *per stirpes*, has been held to constitute a sufficient ground for presuming that a like principle was to govern the gift of the capital."

The leading case is *Blackler* v. *Webb*, 2 *P. W.* 383. The bequest there was to my son J., to my son P's children, to my daughter W's children, and to my daughter, M. P. was dead, and W. living, at the date of the will. Lord King held that by the words of the will it must go *per capita*.

In *Butler* v. *Stratton*, 3 *Bro. C. C.* 367, the direction was to divide the proceeds of sale equally between R. S., J. S., and the children of M. P. Lord Thurlow held that the four children of M. P. each took *per capita* with R. S. and J. S.

In *Barnes* v. *Patch*, 8 *Ves.* 604, the testator directed the remainder to be equally divided between his brother L's and his sister E's families. Sir William Grant held that the children of L. and E. took *per capita*, holding that family meant children.

In *Lincoln* v. *Pelham*, 10 *Ves.* 166, the gift was to be equally divided among the younger children of N. by C., and the younger children of S.; C. and S. being the daughters of testatrix. Lord Eldon held himself constrained by the decisions, to hold that the children all took equally *per capita*, though he doubted if that was the intention.

In *Williams* v. *Yates*, *C. P. Cooper* 177, the testator directed £400 to be divided equally between his son D. and the children of his son R. Lord Langdale, master of the rolls, held, it must be divided among them *per capita*.

In *Pierce* v. *Edmeades*, 3 *Y. & C. Ex.* 246, the bequest was to testator's grandchildren, E. and G., for their respective

lives, in equal shares, and at the death of E. and G., unto all and every child and children, if more than one, of E. and G., in equal shares. E. died, leaving several children. The court held, in a well considered opinion delivered by Lord Abinger, that the children of both E. and G. were entitled to take eqally, *per capita*, the whole, but not until the death of G.; holding that the words "respectively in equal shares," when not controlled by other words in the will, created a tenancy in common or *per capita*.

In *Dowding* v. *Smith*, 3 *Beav.* 541, the bequest was of "the residue to J. S. and *to* the children of M. S., to be equally divided." Lord Langdale directed a division *per capita*, a little doubting on account of the repetition of the word *to*.

In *Brett* v. *Horton*, 4 *Beav.* 239, the devise was of rents to A., B., C., and the widow of E., until E's children attain twenty-one; then to sell and divide the proceeds between A., B., C., and the children of E., in equal shares and proportions, as tenants in common. Lord Langdale held that the words "dividing the proceeds" would, standing alone, give it *per capita*, but that the division until sale showed a different intention, and controlled the words.

In *Flinn* v. *Jenkins*, 1 *Coll.* 365, the words were, "the residue to be equally divided between my two sons, for their lives only, and then to be equally divided among their children." Sir Knight Bruce, V. C., held that the children of the sons took *per capita*. He gives no reasons, and cites no authorities.

In *Rickabe* v. *Garwood*, 8 *Beav.* 579, the bequest was on the death of T. R., (the tenant for life,) to E. P., if living, but if dead, to, between, and among the children of said E. P., and the children of said T. R., who should be then living, equally to be divided between or among them, share and share alike, if more than one, and if but one, the whole to that child. E. P. survived T. R. Lord Langdale held that E. P. took equally with each of the five children of T. R.

In *Alvon* v. *Mellish*, 1 *De Gex & Smale* 355, bequest to E.

C., S., and M., to be by them equally divided, share and share alike, and at their death to be equally divided, share and share alike, among their children. Sir L. Shadwell, V. C., held that the words "their children" must mean "their respective children," and that the children of each took only their parents' share.

In *Baker* v. *Baker*, 6 *Hare* 269, the directions were, to transfer the proceeds of sale "unto, between, and among my said brother and my sisters, and my nephews and nieces, living at the time of the death of my said wife, in equal shares and proportions." Shadwell, V. C., held that all took *per capita* equally, saying, "in the absence of something in the context of the circumstances of the case to exclude the natural import of the testator's words, I am bound to give them their natural effect."

In *Abrey* v. *Newman*, 16 *Beav.* 431, upon a bequest of property to be equally divided between B. J. and his wife, and C. A. and his wife, during their natural lives, after which to be equally divided between their children, that is to say, the children of B. J. and C. A. above mentioned, it was held by Sir. J. Romilly, master of the rolls, that the children took *per capita.*

In *Congreve* v. *Palmer*, 16 *Beav.* 435, the testatrix gave £3000 to her daughter for life, and at her death without children or appointment, to and equally among her sisters *or* their children living at her decease. Romilly, Master of the Rolls, held that the word *or* showed that the sisters' children were meant to be substituted for their parents, and therefore took *per stirpes.*

. In *Walker* v. *Griffin's Heirs*, 11 *Wheat.* 375, the will directed the balance to be given to the families of C. and J. T. Griffin's heirs, in equal proportion. The court, in the opinion by Marshall, C. J., held that these words, *in connection with preceding bequest*, mean by families *per stirpes*, and not *per capita ;* the family of C. and of J. T., each one moiety. This construction is placed on a preceding bequest, not on *the words* of this.

In *Bool* v. *Mix*, 17 *Wend.* 119, and *Jackson* v. *Luquere*, 5 *Cow.* 221, the question was on the construction of Aert Middagh's will. The devise was, " I give unto my two daughters, M. and N., the remainder of my land, to be equally divided between them, share and share alike, and to be to them for and during their natural life; and at their death, then to be to their and each of their children, and to be divided between them, share and share alike;" and it was held to be divided *per stirpes.* Woodworth, J., on *p.* 228, 5 *Cow.*, rightly puts the case upon the division for life between M. and N., and the devise over being evidently intended of the share of each equally to her children.

In this state there are two cases that bear upon this question. *Roome* v. *Counter*, 1 *Halst. R.* 111, and *Smith* v. *Curtis*, 5 *Dutcher* 345.

In *Roome* v. *Counter*, the testator had one son, Henry, and four daughters, Anna, Susannah, Elizabeth, and Sarah, living. His son Peter, to whom in his life testator had given a farm, was dead, leaving ten children. One daughter had died, leaving two children. The bequest was, " Item, it is my will that all the remainder of my movable estate shall be equally divided; that is to say, among Henry Counter, and the heirs of my son, Peter Counter, Anna Roome, Susannah Berry, Elizabeth Dodd, and Sarah Counter."

Chief Justice Kirkpatrick remarks that the decision of Lord King, in *Blackler* v. *Webb*, was an extraordinary one, and such as would hardly be made by any court at this day, and holds that Peter's heirs take *per stirpes.* And he arrives at this conclusion from the plain simple meaning of the words in the order in which they stand, and the manifest intention of the testator, to be derived as well from the circumstances of the case as from the words themselves. The words of Counter's will, from the manner in which they are placed, admit of a very different construction from the words in Skillman's will, and the words in the cases cited, and I think will warrant the construction given, without shaking the authority of

*Blackler* v. *Webb.* Yet the court is not satisfied to rest on this, but calls in the aid of the circumstances of the case.

In *Smith* v. *Curtis,* the property was given " to be equally divided between my brother J., my sister H., and the brothers and sisters of my deceased wife." The court adhere to the doctrine of *Blackler* v. *Webb* as the rule in this state, stating that the words of the will, in *Roome* v. *Counter,* warranted the decision which was placed upon the words and circumstances. Chief Justice Whelpley, on *p.* 342, says : "While recognizing the case of *Blackler* v. *Webb* as correctly decided, I think that where there is any expression in the will by which it can be perceived that the testator intended a division by stocks, that intention should be carried out."

Thus the doctrine is established by a series of well considered cases, both in England and this country, that a devise or bequest like that under consideration, unless qualified by other parts of the will, gives the property to children and grandchildren equally, *per capita.* On this point the cases are uniform, and are in accordance with the principle that should govern them, the rule of interpretation mentioned above. And there can be no doubt but that the fourth clause of this will gives the residue to the children of the testator's deceased children equally with his living children, unless there is something in the other provisions of the will to control that clause.

The third clause of the will, which gives to his daughter Ann, to whom he had given no outset, two thousand dollars, contains this comment : " This is my view, making her equal with my other children." This expressly declares that it is his design and object to make his children equal.

This object will not be effected if the children of one of his deceased daughters receive four times as much out of the bulk of his estate as his daughter Ann. He has just given her two thousand dollars to make her portion equal to that of her deceased sister. This will, in accordance with the doctrine so clearly laid down by Chief Justice Whelpley, and by Jarman, and acted on in several of the cases cited, control

the natural meaning of the words, and the children of each of the testator's deceased children will collectively take one eighth.

The next question is, whether the complainants are entitled to an account from the executors, and for what shall they be held responsible.

Accounts have been stated and re-stated in the Orphans Court of Hunterdon. Those of the executors, David B. Skillman and Jacob Skillman, have been rendered separately. William has rendered none. These accounts, if they were final accounts, rendered upon notice to all parties interested by advertising or citation as directed by law, would be conclusive in this court, and could not be opened or changed for error or mistake, although under certain circumstances they could be inquired into and corrected for fraud. But there is nothing in the case that shows them to be final accounts, or rendered upon notice or citation. The original accounts are not before me. The copies that were offered as exhibits before the master were not produced at the hearing, and are said to be lost, and the original, it is said, cannot be found in the office of the surrogate. If they were so confused, indefinite, and unsatisfactory as the re-statements of them, of which copies are before me, their loss is no injury.

From the facts that are before me I am much inclined to think that they were not accounts of the nature that renders the re-statement of them binding on this court, or that will prevent it, in the present suit, from examining into the matters contained in them. It is very difficult to tell what they do import as re-stated. It is hardly possible that they intend to hold that Jacob is liable for the amount of David's note, of which he has not received a dollar, and that David, who has never paid any part of his note, except three hundred dollars interest paid to William, is discharged from it. Yet such might be inferred from the fact that the full amount of this note, including the interest paid to William, is included in the balance stated to be in Jacob's hands, and is not in-

cluded in the balance in the hands of David. The contrary is admitted by David's answer, and the offers in it.

I shall, therefore, disregard these re-stated accounts, except so far as they are taken as true by the pleadings and proofs in the cause.

The main question is as to the loss on the sale of the testator's homestead lot at Ringoes.

It was sold at first for five thousand two hundred dollars. The purchaser did not take the property, but four hundred dollars damages were recovered from him. It was afterwards sold by Jacob for four thousand five hundred dollars to some person who bought for Jacob. David was unwilling to convey to this purchaser, and the property was suffered to remain unsold until it was sold pending this suit, with the approbation of this court, for three thousand six hundred and forty dollars. This involved a loss of eight hundred and sixty dollars, which the complainants claim the executors must make good.

The evidence shows clearly that the property could have been sold, in the winter and spring of 1860, for four thousand five hundred dollars. The witness, Higgins, was then willing and ready to give that price. Jacob, through A. H. Landis, was willing to give that price. William would have conveyed to either. But Jacob prevented a sale to Higgins by the unlawful attempt to buy for himself.

David refused to sell to Landis for Jacob, on the insufficient pretence that it was unlawful for Jacob to buy. The only defect in such sale would have been in Jacob's title; he was willing to risk that and get it confirmed by releases. Although two years had elapsed since testator's death, and they were derelict in their duty, neither made any honest attempt to sell. David walked away from the sale and never made any effort to find a purchaser. His energies were directed to balking Jacob. And Jacob neglected and refused to perform his duty in effecting a sale of the property, by attempting to compel his co-executor to join in an illegal conveyance to himself.

Executors have no right to accept their office and its emoluments, and then neglect their duty. They are as much liable for loss by non-feasance as by malfeasance. In this case each of these executors is grievously in fault. Either should, without hesitation, be compelled to pay the whole amount of the loss, if the other were not in fault. It is impossible to decide which is in the greater wrong, and the loss must be paid by them equally. Each must pay one-half of the sum of eight hundred and sixty dollars, with interest at six per cent., since April 1st, 1860.

The interest paid by David to William, who is insolvent, was paid by him at his own risk.

The fact that William had procured the note of David from Jacob, for the purpose of copying it, does not make Jacob chargeable with this three hundred dollars. William could not have compelled David to pay it; he was a volunteer, and there the rule applies that one executor placing funds in the hands of a co-executor who wastes them, is liable for the same.

Jacob is liable for all loss occasioned by his delivering up to William his mortgage to be canceled. The testator left this debt well secured. Jacob voluntarily delivered up the security. By this the debt was lost. The testator was surety for William on a bond; that bond would have been paid by William's portion, and was at no risk. Jacob had no right to give up the mortgage, and ask that William's share should be appropriated to pay the unsecured mortgage bond, and thus leave the complainants and other devisees to lose the surety debt, which the testator had left safe.

Jacob must be charged with six thousand two hundred and twenty-four dollars and sixty-two cents, the balance on his Orphans Court account, less the three thousand one hundred and fifty dollars, the amount of David's note charged in that account against him, and the three hundred dollars interest paid William, both of which are included in that balance, and with interest from March 21st, 1861, the date of the re-stated account.

David must be charged with four thousand and sixty-six

dollars and eighty-two cents, the balance of his Orphans Court account, with interest from March 21st, 1861, and with the amount of principal and interest due upon his note, including the sum of three hundred dollars paid to William for interest.

If the sum paid by David to William for interest, was paid before the mortgage of William was canceled, then David shall be allowed to credit that sum as paid by him to William, on his distributive share.

Jacob shall be allowed to pay, on William's distributive share, the amount of principal and interest due on William's bond, after having deducted from said distributive share, first, the amount paid for said surety bond, with interest, and also, the three hundred dollars paid by David to William, if the same was paid by David before the mortgage of William was given up to be canceled.

Each is to be charged with all moneys received by him since the confirmation of the re-stated accounts, and to be credited with all moneys paid out by him since then ; but not with any payments made since said accounts, for costs or counsel fees.

The residue of the estate, as thus ascertained, must be divided into eight shares as above directed, and each executor shall be entitled, in settling with the residuary legatees, to be allowed the amount paid such legatees, with interest from the date of payment.

The costs of this suit must be paid by the executors out of their own estate.